IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FEB - 7 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

AQUILENT, INC.,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )      Civil Action No. 1:11-cv-393
                                   )
DISTRIBUTED SOLUTIONS, INC.,       )
                                   )
            Defendant.             )

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendant Distributed Solutions, Inc.'s ("DSI") Motion for Summary Judgment and Partial Summary Judgment, and on Plaintiff Aquilent, Inc.'s ("Aquilent") Motion for Partial Summary Judgment. This case concerns Aquilent's allegations that DSI, in addition to inducing Aquilent's foreseeable detrimental reliance that DSI would continue to support Aquilent should Aquilent be awarded a follow-on contract with the United States Department of Veteran Affairs (the "VA"), breached its underlying subcontract with Aquilent when DSI failed to perform after the original period of performance because the subcontract had been extended. DSI filed a single counterclaim for breach of contract against Aquilent, alleging that Aquilent failed to pay invoiced amounts due and owing to DSI pursuant to the terms of the subcontract. DSI also purports to assert as part of its breach of contract

counterclaim that Aquilent failed to pursue DSI's claim for
additional user fees to the VA, and did so in bad faith.  There
are four issues before the Court.  The first issue is whether
the parties' subcontract was extended for an additional five
years, such that DSI's refusal to perform after the original
period of performance would constitute a material breach of the
subcontract.  The second issue is whether DSI's conduct in the
final months of the original period of performance amounted to
promises upon which DSI could reasonably expect for Aquilent to
believe that the subcontract would be extended and, if so,
whether these promises did induce Aquilent to rely to its
detriment by securing a follow-on contract with the VA.[1]  The
third issue is whether DSI is entitled to judgment as a matter
of law on its breach of contract counterclaim for certain of its

---

[1] DSI raises the threshold issue here that Virginia law, which does not
recognize an affirmative cause of action for promissory estoppel,
applies to Aquilent's promissory estoppel claim, such that Aquilent's
claim for promissory estoppel should be dismissed.  However,
Virginia's choice of law rules, which do apply in this case because it
was filed in Virginia, Dreher v. Budget Rent-A-Car Sys., 634 S.E. 2d
324, 326 (Va. 2006), mandate that in a cause of action that sounds in
contract, choice of law is first determined by any applicable forum
selection clause in the relevant contract, and the parties' choice is
enforceable so long as the clause is not void for public policy
reasons.  Paul Bus. Sys. v. Canon U.S.A., 397 S.E. 2d 804, 807 (Va.
1990).  It appearing that Aquilent's promissory estoppel claim does
sound in contract, and there being no suggestion that the parties'
subcontract does not contain an enforceable Maryland forum selection
clause, the Court finds that Aquilent's affirmative promissory
estoppel claim in Count II of the First Amended Complaint is properly
before the Court.

invoices to Aquilent that remain unpaid, and for which Aquilent has invoiced the VA and received payment.  The fourth issue is whether the second portion of DSI's breach of contract counterclaim related to Aquilent's wrongful failure to pursue DSI's claim for additional user fees to the VA, a theory of recovery that emerged at some point during discovery, and for which supporting allegations are entirely absent from DSI's counterclaim pleading, is properly before the Court.  For the reasons stated herein, the Court will grant DSI's Motion for Summary Judgment and Partial Summary Judgment, and, further, will grant Aquilent's Motion for Partial Summary Judgment.

Plaintiff Aquilent, a Delaware Corporation, has served the federal government as a provider of information technology services, including web application design and management, automation of business processes, and integration of existing systems.  Defendant DSI, a Virginia Corporation, is a provider of acquisition software solutions and subject matter consulting services, including software maintenance and support services.  Since 2003, Aquilent has provided information technology services to the VA in support of its Electronic Contract Management System ("eCMS"), which the VA uses to manage its contract procurement system.  The VA's eCMS is composed of three software components, and Aquilent provided support for each.  One of the three components is known as the Automated

Acquisition Management System ("AAMS"), which the VA uses in the contract solicitation process to generate contract documents and track the progress of contract solicitations.

This case arises out of a March 2006 contractual relationship entered into by Aquilent and DSI in which DSI agreed to act as a subcontractor to Aquilent to provide its AAMS software solutions and related maintenance and support services to Aquilent, who had entered into a contract with the VA (the "Prime Contract") to provide these and other services. The Prime Contract was a five-year contract terminable, which by its terms expired, at the latest, on March 31, 2011. The contract between Aquilent and DSI (the "Subcontract") had a corresponding duration and also expired, at the latest, on March 31, 2011. Article 2.1 of the Subcontract provided, in pertinent part, "This Agreement may be extended by mutual written agreement of the parties."

In late 2009, while the Prime Contract and Subcontract were still in force, Aquilent became aware that AAMS was presenting certain operational challenges for the VA. DSI recommended to Aquilent that the VA might want to upgrade the then-current version of AAMS, Version 6, to Version 7. Aquilent was initially reluctant to raise the issue with the VA because of the increased cost of the upgrade. On December 6, 2009, however, DSI submitted a proposal to Aquilent which offered to

provide discounted pricing for its software, maintenance and
support services for a period extending late into Fiscal Year
2015, far beyond the term of Aquilent's Prime Contract with the
VA.

On December 9, 2009, Aquilent, with DSI's help, offered the
AAMS Version 7 upgrade to the VA with the discounted prices
authorized by DSI and for period extending through 2015.
Aquilent's offer to the VA, which was provided to DSI, contained
the following language:

> As part of this complete quotation we also include
> discounted pricing terms for [the upgrade to AAMS
> Version 7]. We recognize this offer extends beyond
> the period of performance of Aquilent's eCMS
> [contract]. But, DSI offers to honor the terms as
> quoted here, beyond the term of Aquilent's contract,
> through FY2015.

The VA accepted Aquilent's offer and issued a task order dated
December 16, 2009, authorizing the upgrade to AAMS Version 7.

In turn, Aquilent issued a task order under the Subcontract
to DSI, "Subcontract Task Order No. 1," which it then presented
to DSI for signature. This Task Order No. 1, by its terms, was
an amendment to the March 2006 Subcontract between Aquilent and
DSI: "Pricing [for the upgrade] is based upon the Terms and
Conditions mutually agreed upon in the Subcontract between
Aquilent and DSI . . . . [A]ll Subcontract and GSA Terms and
Conditions shall apply." Subcontract Task Order No. 1 showed
the agreed annual cost to Aquilent of DSI's subscription and

maintenance services through 2015: "DSI has provided pricing through 2015, and this Order serves to document the pricing terms and conditions." Subcontract Task Order No. 1 also contained the following provision: "It is hereby acknowledged by the Parties that Aquilent's VA contract expires March 2011, and that the Aquilent-DSI Subcontract expires March 2011. If the Government extends Aquilent's contract beyond March 2011, it is anticipated that Aquilent will extend the Subcontract Period of Performance via written modification issue[d] to DSI." DSI's Chief Executive Officer, Daniel E. Carr, uneventfully executed Subcontract Task Order No. 1 on February 17, 2010.

As the Prime Contract was to expire at the end of March 2011, the VA published a request for proposals in mid-2010. The VA's proposal required all bidders to incorporate into their response the use of DSI's AAMS software together with maintenance and support. Aquilent represented in its bid documents that it either had or would have an agreement with DSI to support its proposal. In fact, DSI had already agreed to an exclusive Teaming Agreement with STG, Inc. to competitively bid the VA proposal in competition with Aquilent.

Despite competition from DSI, Aquilent won the bidding competition and was awarded a new prime contract (the "New Prime Contract") by the VA. Immediately, Aquilent attempted to engage in negotiations with DSI for the software and maintenance and

support services required by the New Prime Contract.  In late January, Aquilent sent DSI a Memorandum of Agreement incorporating many of the terms it desired to incorporate into a proposed new subcontract between the two.  When DSI would not agree to it, Aquilent sent a second Memorandum of Agreement in a continuing effort to enlist DSI's agreement to continue providing maintenance and support services for Aquilent and the VA during the New Prime Contract period of performance.  DSI again resisted.

On March 31, 2011, the date the Prime Contract and the Subcontract expired, Aquilent sent a third document to DSI entitled "Subcontract Modification," under which Aquilent purported to declare an extension of the Subcontract with DSI to September 30, 2015.  Although Aquilent considers the document to be declaratory in nature, the Subcontract Modification it sent to DSI requires DSI's signature and states, "The Subcontractor is requested to forward a signed copy of this Task Order to the Aquilent Contractual POC identified above.  Aquilent will return a fully executed copy."  DSI never signed this document.

Observing that DSI had no intention of performing for Aquilent, STG, Inc. filed a protest of the VA's award to Aquilent based on the fact that Aquilent would not be able to supply DSI's AAMS services as required under the New Prime Contract.  As a result of STG Inc.'s protest, the VA initially

considered holding Aquilent in default.  However, on April 21,
2011, Aquilent sent a letter to the VA requesting that the VA
terminate the New Prime Contract "For Convenience."  On April
22, 2011, the VA agreed to the requested termination, and the
parties executed a modification of the New Prime Contract and a
Settlement Agreement.  The modification reduced the total amount
of the New Prime Contract from $7,329,435.48 to $78,679.52, and
in the Settlement Agreement, Aquilent agreed to accept the total
sum of $78,679.52 in full satisfaction of any and all claims
that Aquilent might have related to the termination.

     Related to the foregoing, Aquilent provided the VA certain
goods and services under the original Prime Contract, including
goods and services provided by DSI under the Subcontract.  When
DSI issued several invoices totaling a sum of approximately
$448,000, Aquilent, in turn, invoiced the VA for this amount.
The VA made payment to Aquilent for all but $79,650.21 of the
approximately $448,000 worth of work performed by DSI, roughly
$369,000.  Although the Subcontract required Aquilent to pay DSI
such sums due and owing within five (5) days of receiving
payment from the VA, Aquilent has withheld these funds.  Upon
receiving payment from the VA, Aquilent placed approximately
$205,000 in escrow pending the outcome in this litigation, and
to be used to offset any damages it may be awarded.  Aquilent
placed the remaining $164,000 into a general operating account.

DSI has never agreed to Aquilent's holding of these funds, and continues to seek payment on from Aquilent on the outstanding invoices.

Unrelated to the foregoing, but while the Prime Contract and Subcontract were in force, the VA purchased, through Aquilent, a subscription from DSI to provide maintenance and support services for as many as 1,000 VA users but not more. Through a subsequent audit, DSI determined that it had been offering maintenance and support services on AAMS Version 6 to over 2,000 VA users—well beyond limits of the VA's subscription. DSI determined that it was entitled to be paid an additional $531,975.15 by the VA for permitting almost twice as many users to access DSI's services as the subscription permitted. Aquilent agreed to sponsor DSI's claim, and invoiced the VA for $574,533.81, the amount billed by DSI plus Aquilent's customary 8% subcontractor management fee. Soon after Aquilent submitted DSI's claim to the VA, it became clear that the VA did not have sufficient funds to pay for its overuse. Aquilent was notified that if DSI were to be paid by the VA, payment would have to come from out of the ceiling amount that Aquilent could get from the VA, which would deplete future monies to Aquilent for the remainder of the Prime Contract period. Nearing the end of its Prime Contract with the VA and aspiring to be awarded the New Prime Contract, Aquilent decided not to continue to press DSI's

claim with the VA in late 2010.  To date, DSI remains
uncompensated for the unauthorized additional users of DSI's
maintenance and support services at the VA.

Aquilent filed its Verified Complaint on April 14, 2011,
asserting that the Subcontract was properly extended and that
DSI's failure to perform after March 31, 2011 was a material
breach of the Subcontract.  DSI filed a Motion to Dismiss the
Verified Complaint on May 4, 2011.  The Court issued an Order on
June 3, 2011 granting in part and denying in part DSI's Motion
to Dismiss, and allowing Aquilent fourteen days to file an
Amended Complaint.  Aquilent timely filed its First Amended
Complaint on June 17, 2011.  In its First Amended Complaint,
Aquilent alleges the following Counts:  I (Breach of Contract);
II (Promissory Estoppel); III (Fraud); IV (Constructive Fraud);
V (Tortious Interference with Contract); and VI (Tortious
Interference with Business Expectancy).  On July 5, 2011, DSI
filed a Motion to Dismiss the First Amended Complaint.  By Order
dated September 9, 2011, this Court granted the Motion in part
and denied the Motion in part.  The Court granted the Motion as
to Counts III-VI, but denied the Motion as to Counts I and II,
the breach of contract and promissory estoppel claims.  On
September 28, 2011, DSI filed its Answer to the First Amended
Complaint, and asserted a single counterclaim against Aquilent
for breach of contract.

DSI now moves the Court for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the remaining breach of contract and promissory estoppel claims in the First Amended Complaint, and for partial summary judgment on a portion of its counterclaim that asserts that Aquilent improperly refused to pay approximately $369,000 in certain DSI invoices for services performed.  Aquilent now moves the Court for summary judgment pursuant to Rule 56 on the other portion of DSI's counterclaim concerning Aquilent's improper failure to pursue DSI's claim for additional user fees to the VA.

The Court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56.  Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The Court construes all reasonable inferences in favor of the non-moving party when determining whether there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The mere existence of some disputed facts does not merit a trial unless the disputed facts are material to an issue necessary for proper resolution of the case and the quality and quantity of the evidence offered to support a

question of fact are adequate to support a jury verdict.

Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d

1317, 1323 (4th Cir. 1995).

The Fourth Circuit has identified contract interpretation

claims as especially unsuitable for summary judgment: "A court

faces a conceptually difficult task in deciding whether to grant

summary judgment on a matter of contract interpretation." Wash.

Metro. Area Transit Auth. v. Potomac Inv. Props., Inc., 476 F.3d

231, 235 (4th Cir. 2007). That difficulty exists because

"[o]nly unambiguous writing justifies summary judgment without

resort to extrinsic evidence, and no writing is unambiguous if

susceptible to two reasonable interpretations." Id. In

resolving the issues of contract interpretation presented by

this Subcontract, the Court engages in the analysis prescribed

by the Fourth Circuit:

> The first step for a court asked to grant summary
> judgment based on a contract's interpretation is,
> therefore, to determine whether, as a matter of law,
> the contract is ambiguous or unambiguous on its face.
> If a court properly determines that the contract is
> unambiguous on the dispositive issue, it may then
> properly interpret the contract as a matter of law and
> grant summary judgment because no interpretive facts
> are in genuine issue. Even where a court, however,
> determines as a matter of law that the contract is
> ambiguous, it may yet examine evidence extrinsic to
> the contract that is included in the summary judgment
> materials, and, if the evidence is, as a matter of
> law, dispositive of the interpretative issue, grant
> summary judgment on that basis. If, however, resort to
> extrinsic evidence in the summary judgment materials
> leaves genuine issues of fact respecting the

> contract's proper interpretation, summary judgment
> must of course be refused and interpretation left to
> the trier of fact.

Wash. Metro. Area Transit Auth., 476 F.3d at 235 (emphasis

added). Only after interpretation of the Subcontract, is it

possible for the Court to determine if a breach of the

interpreted provision occurred.

At issue is whether Aquilent and DSI extended the

Subcontract beyond March 31, 2011 for an additional term through

September 30, 2015. Aquilent makes two contentions that the

Subcontract was extended. First, Aquilent contends that

Subcontract Task Order No. 1, constituted an extension of the

Subcontract by mutual written agreement pursuant to Article 2.1

of the Subcontract. Second, Aquilent asserts that the terms of

Subcontract Contract Task Order No. 1, which amended the terms

of the Subcontract, gave Aquilent the right to unilaterally

extend the period of the Subcontract between it and DSI.

Specifically, Aquilent relies on the language, "If the

Government extends Aquilent's contract beyond March 2011, it is

anticipated that Aquilent will extend the Subcontract Period of

Performance via written modification issue[d] to DSI."

The Court grants DSI's Motion for Summary Judgment as to

Aquilent's breach of contract claim because the Court finds as a

matter of law that the Subcontract was never extended beyond

March 31, 2011. The Subcontract very clearly states that, "This

Agreement may be extended by mutual written agreement of the parties." Having been bilaterally executed by DSI's Chief Executive Officer, Subcontract Task Order No. 1 certainly suffices as a mutual written agreement of the parties. However, Subcontract Task Order No. 1 is insufficient as a matter of law either to authorize the extension of the Subcontract or to authorize a future right in Aquilent to unilaterally extend the Subcontract for three independent reasons.

First, the record is replete with evidence that Subcontract Task Order No. 1 was a mutual agreement on future pricing obligations of DSI through 2015, but nothing more. Subcontract Task Order No. 1 states, "DSI has provided pricing through 2015, and this Order serves to document the pricing terms and conditions." This unambiguous provision establishes that all DSI was assenting to when it executed Subcontract Task Order No. 1 was a pricing structure for the AAMS upgrade, and not an extension of the Subcontract. Moreover, the one provision in Subcontract Task Order No. 1 that even mentions the word "extend," speaks of Subcontract extension as an "anticipated" future event and not an event being accomplished by DSI's execution of Subcontract Task Order No. 1:  "If the Government extends Aquilent's contract beyond March 2011, it is anticipated that Aquilent will extend the Subcontract Period of Performance via written modification issue[d] to DSI." This unambiguous

language completely undercuts Aquilent's theory that Subcontract Task Order No. 1 amounted to an extension of the Subcontract and, as such, Aquilent's first contention must fail.

Second, Aquilent's conduct following the execution of Subcontract Task Order No. 1 is inconsistent and undercuts both of its contentions.  The facts are undisputed that even after Subcontract Task Order No. 1 was executed, Aquilent attempted three additional times to come to an agreement was DSI on extending the Subcontract or negotiating a follow-on subcontract to parallel the New Prime Contract Aquilent had just been awarded by the VA.  It goes without saying that if Aquilent, during this time, believed either of its theories—(1) that Subcontract had been extended or (2) that it had the right to unilaterally extend the Subcontract—Aquilent would have had no need to busy itself on three separate occasions with trying to extend, renegotiate, or execute a new subcontract with DSI. This happpenstance makes clear that Aquilent neither thought nor intended Subcontract Task Order No. 1 to have any effect upon the extendibility of the Subcontract.  Rather, both Aquilent and DSI understood the unambiguous language of Subcontract Task Order No. 1 to constitute an agreement on the availability of future discounted pricing for DSI's software.  It was only after it became clear that DSI wanted out at the expiration of the Subcontract that Aquilent feared for its New Prime Contract and

issued a document to DSI purporting to unilaterally extend the terms and conditions of their Subcontract. For this reason, both of Aquilent's contentions fail.

Third, assuming arguendo that Subcontract Task Order No. 1 gave Aquilent a right to unilaterally extend its Subcontract with DSI, there existed an unfulfilled and unambiguous condition precedent, preventing Aquilent from ever exercising such a right: "If the Government extends Aquilent's contract beyond March 2011, it is anticipated that Aquilent will extend the Subcontract Period of Performance via written modification issue[d] to DSI" (emphasis added). The unambiguous condition precedent is the VA extending Aquilent's Prime Contract beyond March 2011, which did not occur. Although Aquilent was awarded the New Prime Contract, that contract was an entirely new contract and not an extension of the original Prime Contract between the parties. This conclusion is obvious upon giving the word "extends" its plain meaning. Because the original Prime Contract was not in fact "extended" as required by the Subcontract, Aquilent never had the opportunity to exercise this hypothetical right and, therefore, Aquilent's contentions again must fail.

In sum, DSI is entitled to summary judgment on Aquilent's breach of contract claims because, given the undisputed facts and unambiguous language of the Subcontract, the parties' never

successfully extended the Subcontract. The Subcontract required the mutual assent of both parties to extend the Subcontract beyond March 2011. Although Subcontract Task Order No. 1 contained a pricing agreement, no reasonable construction of that Task Order supports the outcome that there was mutual assent by the parties to extend, or mutual assent to authorize Aquilent to unilaterally extend the Subcontract. Aquilent tried, unsuccessfully, to get DSI's mutual assent on March 31, 2011 when it sent over the Subcontract Modification document. However, even that document contained bilateral contract language and sought DSI's signature; DSI never signed that document. Having never executed an extension of the Subcontract, DSI had no obligations to Aquilent after March 2011 and could not, therefore, be in breach of contract. Accordingly, DSI is entitled to summary judgment on Aquilent's breach of contract claims.

The essence of promissory estoppel is reasonable detrimental reliance based on the conduct of another that induces the other to act. Although promissory estoppel is not a cognizable cause of action under Virginia law, Maryland law, which applies to this claim for the reasons stated supra, does recognize such a cause of action. Pavel Enters. Inc. v. A.S. Johnson Co., 674 A.2d 521, 531-32 (Md. 1996). To establish a claim for promissory estoppel under Maryland law, a plaintiff

must establish:  (1) a clear and definite promise; (2) where the
promisor has a reasonable expectation that the offer will induce
action or forbearance on the part of the promisee; (3) which
does induce actual and reasonable action or forbearance by the
promisee; and (4) causes a detriment which can only be avoided
by the enforcement of the promise.  Id. at 532.  Maryland law
further requires the Court to find that binding the
subcontractor under this equitable doctrine is necessary to
prevent injustice.  Citiroof Corp. v. Tech Contracting Co.,
Inc., 860 A.2d 425, 433 (Md. Ct. Spec. App. 2004).

    The Court grants DSI's Motion for Summary Judgment on
Aquilent's promissory estoppel claim because Aquilent fails to
demonstrate as a matter of law that DSI, by executing
Subcontract Task Order No. 1, could reasonably expect to and did
induce Aquilent's foreseeable detrimental reliance that the
Subcontract would be extended beyond March 2011.  While Aquilent
contends that it relied and was induced to rely on Subcontract
Task Order No. 1 as a promise by DSI that the Subcontract was or
would be extended, the evidence does not support Aquilent's
reliance to be reasonable.  Aquilent's contention here is
undercut by the facts that on three separate occasions
subsequent to the execution of Subcontract Task Order No. 1,
Aquilent attempted to renegotiate or extend the Subcontract with
Aquilent.  As noted above, these circumstances establish that

Aquilent neither thought nor intended Subcontract Task Order No.
1 to have any effect upon the extendibility of the Subcontract.
Rather, it is apparent both Aquilent and DSI understood the
unambiguous language of Subcontract Task Order No. 1 to
constitute an agreement on the availability of future discounted
pricing for DSI's software.  Therefore, Aquilent's actions
indicate that it did not have a reasonable expectation that DSI
would assent to or facilitate an extension of the Subcontract.
Aquilent's decision to forge ahead with the New Prime Contract
was certainly unfortunate, but it is clear that, to the extent
Aquilent was motivated by DSI's execution of Subcontract Task
Order No. 1, its reliance was not reasonable.  Accordingly,
there being no genuine dispute of a material fact, DSI is
entitled to summary judgment on Aquilent's promissory estoppel
claim.

The Court also finds that DSI is entitled to partial
summary on the portion of DSI's counterclaim that claims
Aquilent breached the Subcontract by refusing to pay
approximately $369,000 in DSI invoices for services performed.
Aquilent admits it received approximately $369,000 from the VA
in payment for DSI's invoices that it had submitted.  The
parties do not dispute that the Subcontract requires Aquilent to
pay DSI within 5 days of receiving payment from the VA.  It is
further undisputed that Aquilent placed a portion of these funds

in escrow as an offset for what it may receive in this
litigation.

Aquilent asserts, however, that whether it was required to
honor the Subcontract provision is a fact in dispute for the
following two reasons:  (1) DSI failed to remedy three defects
identified by Aquilent and the VA; and (2) DSI had a number of
delivery delays of over 35 days, which, under the terms of other
Subcontract Task Orders, entitled Aquilent to a 100% payment
reduction for failure to meet quality levels.  But, even taken
together, those circumstances are patently insufficient to
defeat summary judgment.  Notably, the DSI service goods
Aquilent claims to be defective were ultimately delivered and
accepted by the VA.  As the goods were out in commerce being
used without exception, Aquilent cannot rely on defects which
have been accepted by the VA by virtue of the delivery and use
of the service goods by the VA.  Because Aquilent's assertions
are meritless, Aquilent was bound by its contractual duty to pay
DSI within five days of its receipt of these funds, and its
decision to withhold payment was a breach of the Subcontract.
Accordingly, DSI is entitled to partial summary judgment on its
counterclaim for the approximately $369,000 paid to and withheld
by Aquilent.

With respect to the second portion of DSI's counterclaim
related to Aquilent's wrongful failure to pursue DSI's claim for

additional user fees to the VA, Aquilent is entitled to summary

judgment because DSI failed to properly plead this theory in its

counterclaim.   Federal Rule of Civil Procedure 8(a)(2) requires

but "a short plain statement of the claim showing that the

pleader is entitled to relief," in order to "give the [other

side] fair notice of what the . . . claim is and the grounds

upon which it rests."   Bell Atl. Corp. v. Twombly, 550 U.S. 544,

555 (2007).   However, a claim must also "contain sufficient

factual matter, accepted as true, to state a claim for relief

that is plausible on its face.   Ashcroft v. Iqbal, 129 S. Ct.

1937, 1949 (2009).

Here, DSI has failed to plead sufficient facts to put

Aquilent on notice of the additional users issue, let alone

demonstrate a plausible entitlement to relief for Aquilent's

purported wrongful failure to pursue the submission of DSI's

claim to the VA.   DSI's counterclaim consists of the following

allegations:

> 16.  Aquilent has been paid for the goods and services
> provided by Aquilent to [the VA] under the Prime
> Contract which included the goods and services
> provided by DSI under its Subcontract from the
> Effective Date through on or about March 31, 2011.
>
> 17.  Although Aquilent was paid under its Prime
> Contract it has failed to pay DSI all that was due DSI
> under its Subcontract and the Task Order in an amount
> of not less than One Million Dollars ($1,000,000).
>
> 18.  The failure of Aquilent to pay DSI constituted a
> breach of contract which has resulted in DSI being

>       damaged in an amount of not less than One Million
>       Dollars ($1,000,000).

DSI's counterclaim does not contain a single factual allegation

that Aquilent refused to pursue with the VA a claim for

additional compensation due DSI because the VA had exceeded the

number of permissible users under its subscription.

In fact, it was not until DSI answered Aquilent's damages

interrogatory that Aquilent first learned that DSI was asserting

this theory of recovery under the umbrella of its breach of

contract counterclaim.  Thus, as pled, DSI's counterclaim could

not possibly have placed Aquilent on fair notice that DSI sought

to pursue the additional users issue at all, let alone under a

breach of contract theory.

     DSI asserts that its counterclaim is properly pled, and

states a claim for breach of contract.  DSI also asserts that

Aquilent should not be allowed to attack the pleading at such a

late date, since Aquilent has been able to avail itself of the

discovery process to learn the particulars of the claim.

However, DSI's argument misses the point.  While DSI states a

claim for breach of contract in its counterclaim, it only places

Aquilent on notice of the issue of Aquilent's failure to pay

certain DSI invoices due and owing.  Lacking any such

allegations, DSI's counterclaim cannot possibly place Aquilent

on notice of any circumstances regarding the additional users

issue or demonstrate any plausible entitlement to relief therefrom.  Accordingly, the state of the pleadings require dismissal of DSI's additional users issue, and entitle Aquilent to partial summary judgment on this portion of DSI's breach of contract counterclaim.

For the foregoing reasons, the Court will grant Defendant DSI's Motion for Summary Judgment and Partial Summary Judgment, and Plaintiff Aquilent's Motion for Partial Summary Judgment.

An appropriate order shall issue.

_____/s/_____
Claude M. Hilton
United States District Judge

Alexandria, Virginia
February _7_, 2012